IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

*FILED IN CHAMBERS*
U.S.D.C.   Atlanta

FEB 2 6 2008

JAMES N. HATTEN, Clerk
By: *[signature]*
Deputy Clerk

KAREN W. TOWNSEND,

          Plaintiff,

v.

DELTA FAMILY CARE-DISABILITY
AND SURVIVORSHIP PLAN; DELTA
AIR LINES FAMILY-CARE
DISABILITY AND SURVIVORSHIP
TRUST; THE ADMINISTRATIVE
COMMITTEE OF DELTA AIR LINES,
INC.; and JOHN DOES I-V DELTA
WELFARE BENEFITS PLANS,

          Defendants.

CIVIL ACTION NO.

1:06-CV-2040-JEC

## O R D E R  &  O P I N I O N

This case is presently before the Court on defendants' Motion
for Summary Judgment [26]; plaintiff's Motion for Summary Judgment
[27]; plaintiff's Motion for Leave to File Motion for Summary
Judgment Out of Time [33]; defendants' Objection to Materials Outside
the Administrative Record [43]; and defendants' Motion to Exceed Page
Limitations [45].   The Court has reviewed the record and the
arguments of the parties and, for the reasons set out below,
concludes that defendants' Motion for Summary Judgment [26] should be
**GRANTED**; plaintiff's Motion for Summary Judgment [27] should be

AO 72A
(Rev.8/82)

**DENIED**; plaintiff's Motion for Leave to File Motion for Summary Judgment Out of Time [33] should be **GRANTED**; defendants' Objection to Materials Outside the Administrative Record [43] should be **SUSTAINED**; and defendants' Motion to Exceed Page Limitations [45] should be **GRANTED**.

### BACKGROUND

This is an ERISA case. Plaintiff is a former flight attendant for Delta Air Lines. (Pl.'s Mot. for Summ. J. [27] at 1.) While she worked for Delta, plaintiff participated in an employee welfare plan ("the Plan") that provides short and long-term disability benefits to non-pilot employees. (Defs.' Statement of Undisputed Material Facts ("DSMF") [26] at ¶¶ 1,9.) In August, 2000, the Plan denied plaintiff's claim for long-term disability benefits. (*Id.* at ¶ 22.) After exhausting her administrative remedies, plaintiff filed this lawsuit to recover the benefits allegedly due to her. (Compl. [1].) The parties have filed cross-motions for summary judgment, and several related motions, which are presently before the Court.[1]

---

[1]    Defendants filed an objection to plaintiff's motion for summary judgment because the motion was untimely. (Defs.' Notice of Opp'n to Pl.'s Mot. for Summ. J. [33].) In response, plaintiff submitted a motion for leave to file her summary judgment motion out of time. (Pl.'s Mot. for Leave to File Mot. for Summ. J. Out of Time [33].) In her motion for leave, plaintiff explains that her summary judgment motion was three days late because, in calculating the due date for the motion, her paralegal mistakenly applied the three-day mail extension rule. (*Id.* at 4.) The Court finds that plaintiff's error was unintentional, and that it did not result in any prejudice

2

AO 72A
(Rev.8/82)

## I.   Administration of the Plan

The Plan is a non-contributory employee welfare benefit plan, established and maintained pursuant to the Employee Retirement Income Security Act ("ERISA") to provide both short and long-term disability benefits to non-pilot Delta employees.   (DMSF [26] at ¶ 1.)   The Administrative Committee of Delta Air Lines, Inc. is the Plan Administrator and Named Fiduciary (as those terms are defined by ERISA) for purposes of the Plan's operation and administration. (*Id.*)   The Plan is a legally distinct entity with the power to sue and be sued.   *See* 29 U.S.C. § 1132(d)(1).

The Administrative Committee enjoys the exclusive power to interpret the Plan and to carry out its provisions.   (*Id.* at ¶ 3.) Section 12.01 of the Plan vests in the Administrative Committee the full power to operate and administer the Plan.[2]   (*Id.*)   Section 12.02

___

to defendants.   Accordingly, defendants' Objection to Plaintiff's Motion for Summary Judgment [30] is **OVERRULED** and plaintiff's Motion for Leave to File Motion for Summary Judgment Out of Time [33] is **GRANTED**.

[2]   Section 12.01 of the Plan states in part that:

The operation and administration of the Plan ... the exclusive power to interpret it, and the responsibility for carrying out its provisions are vested in the Administrative Committee of at least three members, which Committee shall be the Administrator of the Plan. ... The Administrative Committee shall establish rules for administration of the Plan and transaction of its business. The Administrative Committee shall be the named fiduciary of the Plan for purposes of operation and administration of

AO 72A
(Rev.8/82)

of the Plan references specific examples of the Administrative Committee's powers and duties. (*Id.* at ¶ 4.) These powers include interpreting and construing the Plan and deciding all questions of eligibility.[3] (DSMF at ¶ 4.) Under the terms of the Plan, the

the Plan. ...

(DSMF at ¶ 3.)

   [3] Section 12.02 of the Plan states in part that:

In addition to the powers and duties otherwise stated in this Plan, the Administrative Committee shall have such duties and powers as may be necessary to discharge its responsibilities under the Plan, including, but not limited to, the following:

(a) To establish and enforce such rules, regulations, and procedures as it shall deem necessary or proper for the efficient operation and administration of the Plan;

(b) The discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Eligible Family Member to participate in the Plan or to receive benefits under it, its interpretation and decisions to be final and conclusive;

(c) To determine the amount, manner, and time of payment of benefits which shall be payable to any Employee or Dependent, in accordance with the provisions of the Plan, and to determine the person or persons to whom such benefits shall be paid;

\* \* \*
(g) To decide all questions concerning the Plan;
\* \* \*
(I) To delegate all its powers and duties as set forth in Section 12.04.

**The Administrative Committee shall have the broadest discretionary authority permitted under law in the exercise**

4

Administrative Committee's decisions are deemed to be final and conclusive.  (*Id.*)

Sections 4.02 and 4.03 of the Plan define the eligibility criteria for short and long-term disability benefits.  Section 4.02 of the Plan states that:

> An eligible Employee shall qualify for Short Term Disability benefits when disabled as a result of a demonstrable injury or disease (including mental or nervous disorders) or pregnancy which prevents the Employee from engaging in the Employee's customary occupation.  The duration of the Short Term Disability period is 26 weeks following the date the disability commenced ...

(Plan § 4.02, attach. to Arpin Decl. [26] at Ex. A.)  Section 4.03 of the Plan states that:

> If upon expiration of the Employee's Short Term Disability period, he continues to qualify for Short Term Disability, the Employee may apply for Long Term Disability.  The Employee shall be eligible for Long Term Disability provided he is disabled at that time as a result of demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent him from engaging in any occupation whatsoever for compensation or profit, including part-time work.

(*Id.* at § 4.03.)

The Administrative Committee delegated the initial disability determination, and the ongoing review of the continuous nature of the

---

> **of all of its functions including, but not limited to, deciding questions of eligibility, interpretation, and the right to benefits hereunder but shall act in an impartial and non-discriminatory manner with respect thereto.**

(DSMF at ¶ 4 (emphasis added).)

AO 72A
(Rev.8/82)

disability, to Aetna Life Insurance Company ("Aetna").  (DSMF [26] at
¶ 5.)  Under the terms of the Plan, if long-term disability benefits
are denied or discontinued, the employee can seek review of that
decision under the Plan's two-level review procedure.  (Id.)  The
first level of review is handled by Aetna, and the second level of
review by the Administrative Committee itself.  (Id.)  At either
level, a claimant may review relevant Plan documents and submit
additional evidence in support of his claim.  (Id.)

     Delta does not directly contribute any money to the Plan.  (Id.
at ¶ 6.)  Instead, Delta pays into a trust fund called the Benefits
Trust.  (DSMF at ¶ 6.)  The Benefits Trust then provides money for
the Plan's provision of benefits.  (Id.)  Delta makes periodic
contributions to the Benefits Trust which can never revert back to
Delta and are thus considered irrevocable.  (Id.)  During the Plan
year ending June 30, 2001, the year in which plaintiff's benefits
were discontinued, the Benefits Trust contained assets far in excess
of the amounts paid out.  (Id.)  Specifically, the Trust had assets
of   $479,645,000   and   paid   $47,776,000   to   participants   and
beneficiaries.  (Id.)

## II.   Plaintiff's Employment and Disability History

     In March, 1999, plaintiff suffered an on-the-job injury to her
left foot.  (Administrative Record ("AR") at DL 29, attach. to Arpin
Decl. [26] at Ex. C.)  Following her injury, plaintiff experienced

AO 72A
(Rev.8/82)

severe residual pain in both of her knees.  (*Id.* at DL 30.)  As a result of her knee pain, plaintiff stopped working on February 7, 2000.  (*Id.* at DL 29.)  She applied for short-term disability under the Plan, and began receiving benefits on February 29, 2000.  (*Id.* at DL 126.)

In May, 2000, plaintiff informed Aetna that she had lost a significant amount of cartilage in both of her knees, and that her doctor recommended that she remain out of work until October, 2000. (*Id.* at DL 29-30.)  Aetna told plaintiff that it could not certify short-term disability for that much time at once, but that it would follow up with plaintiff's treating physician, Dr. Hugh Spruell, to determine the extent of her disability.  (AR at DL 30.)  Aetna also explained to plaintiff that her short-term disability benefits would expire on August 28, 2000, and that she would have to qualify for long-term disability to receive benefits after that date.  (*Id.*)

Shortly after speaking to plaintiff, Aetna contacted Dr. Spruell's office.  (*Id.* at DL 29.)  Dr. Spruell confirmed that plaintiff had loss of cartilage in her knees, and that she had been diagnosed with osteoarthritis.  (*Id.*)  Dr. Spruell stated that he had treated plaintiff with pain medication and prescribed physical therapy.  (*Id.*)  He further commented that he believed plaintiff needed to be out of work for three to six months.  (AR at DL 30.)

On June 30, 2000, Dr. Spruell sent additional information to

7

AO 72A
(Rev.8/82)

Aetna indicating that plaintiff's condition was unchanged and that her disability was "permanent." (*Id.* at DL 31 and DL 43.)   Dr. Spruell stated that plaintiff was taking Voltaren for pain. (*Id.* at DL 43.)   He estimated that plaintiff's return to work date was "Never." (*Id.*)

On August 22, 2000, Dr. Spruell responded to Aetna's questionnaire concerning plaintiff's eligibility for long-term disability benefits as follows:

> As of August 29th because of the seriousness of her knee problems [plaintiff] is totally and continuously disabled from any occupation.  I will qualify that by saying that she can do no job which requires more than 1-2 hours of standing, sitting, if she has to get up and down, or walking.  I would think for this individual that would be any reasonable job.
>
> The functional limitations are that [plaintiff] cannot do long periods of standing.  She must not be required to get up and down from a sitting position, climb stairs, or any job, which requires significant walking.

(*Id.* at DL 39.)   Dr. Spruell also completed a functional capacity worksheet indicating that plaintiff could never climb, crawl, kneel or walk, but that she could occasionally sit, stand, and stoop. (AR at DL 41.)

On August 25, 2000, Dr. R.E. Bonner, Aetna's medical director, reviewed plaintiff's claim file, which included the above information. (*Id.* at DL 33.)   As part of his review, Dr. Bonner spoke with Dr. Spruell. (*Id.* at DL 33-34 and DL 52.)   Dr. Spruell told Dr. Bonner that plaintiff had significant cartilage loss in both

8

knees with complaints of pain that was incompletely controlled by medication. (*Id.*) According to Dr. Bonner, Dr. Spruell further stated that plaintiff could reasonably perform work where she could sit or stand for comfort and change positions as needed. (*Id.*)

Based on the medical evidence in the file and his conversation with Dr. Spruell, Dr. Bonner determined that plaintiff was unable to perform the duties of a flight attendant due to her arthritis. (AR at DL 52.) However, Dr. Bonner concluded that plaintiff was not eligible for long-term disability benefits because she was capable of performing sedentary or part-time work. (*Id.* at DL 34.) Accordingly, Aetna denied plaintiff's claim for long-term disability benefits and informed plaintiff of its decision and her right to appeal. (*Id.* at DL 117.)

In October, 2000, plaintiff requested an appeal of Aetna's decision. (*Id.* at DL 114.) In her support of her appeal, plaintiff stated that her condition "is such that [plaintiff] could not perform her usual duties due to the continuation of problems with her knee." (*Id.*) Plaintiff also submitted a "Pain Questionnaire" and a "Fatigue Questionnaire" completed by Dr. Spruell in support of plaintiff's application for social security disability benefits. (AR at DL 97–100.) In the Pain Questionnaire, Dr. Spruell indicated that plaintiff experienced moderately severe pain in her knees as a result of arthritis, and he checked a box indicating that plaintiff needed

9

to lie down for a minimum of two hours during the daytime and to elevate her legs on a daily basis.  (*Id.* at DL 97-98.)  In the Fatigue Questionnaire, Dr. Spruell checked a box stating that plaintiff required a minimum of two hours of rest during the day. (*Id.* at DL 100.)

On January 9, 2001, Aetna informed plaintiff that it did not have sufficient medical information to review her appeal.  (*Id.* at DL 92.)  Aetna requested all additional medical information that was available for review, including medical records from August, 2000 forward. (*Id.* at DL 80 and DL 92.)  Plaintiff responded by providing Dr. Spruell's office notes dated August 21, 2000 through January 16, 2001, and an office note from Dr. Vanderlyt dated August 3, 2000. (AR at DL 81-91.)  Dr. Vanderlyt's note stated:

> Present Illness: [Plaintiff] has seen Dr. Spruell and is presently on Relafen.  She is doing well.  I have been following her for a long time with symptoms referable to her right knee.  Recently, the left knee had flared up.
>
> Physical Examination:  There is a prominent effusion of the left knee.  The knee is a little warmer than the right, but not remarkably so.  The knee is clinically stable.  I aspirated 60CCs of clear yellow, non-turbid fluid from the knee.  Some cortisone was injected.
>
> X-rays: Weightbearing films are reviewed showing a normal left knee.  She does have about 30 to 40% narrowing of the medial compartment of the right, presently asymptomatic knee.
>
> Diagnosis: I suspect that both knees are showing signs of osteoarthrosis, although no[t] radiographically evident on the left.

AO 72A
(Rev.8/82)

> Plan: Continue conservative treatment as per Dr. Spruell.
> Occasional aspiration may become necessary.  More aggressive
> orthopedic work-up would be indicated only if symptoms
> deteriorate and become refractory to medication.

(*Id.* at DL 83.)  An office visit note from Dr. Spruell dated August

21, 2000 indicated that plaintiff's knee was "much worse" and that

she had fluid drained from her left knee twice, and right knee once.

(*Id.*)  He also noted that plaintiff was "permanently disabled."  (*Id.*

at DL 83.)  In a note dated January 16, 2001, Dr. Spruell prescribed

the following treatment:   "loose [sic] wt., swim, and quad sets."

(*Id.* at DL 82.)

In addition to the above medical records, plaintiff submitted a

letter from Dr. Spruell dated November 21, 2000.  (AR at DL 94.)  The

letter stated:

> [Plaintiff] was first seen by me in February 2000 for a problem
> with her knees.  X-rays did show that she had significant loss
> of cartilage of the knees.  She had had an injury in March and
> I think this injury probably aggravated her condition and she
> may have been asymptomatic before then but I doubt very
> seriously that she developed this much arthritis in that short
> period of time.
>
> She has significant disability because of her job and cannot
> stand for lengthy period [sic] of time.  As a matter of fact,
> she probably cannot stand to walk more than an hour or so in
> any given work day.
>
> Her condition is permanent and will progress and she may, in
> fact, need knee surgery in the future.  Again, it appears that
> the injury brought to head an underlying condition, but she has
> certainly been disabled since that time.

(*Id.*)

11

On February 15, 2001, Dr. Bonner reviewed plaintiff's supplemented file. (*Id.* at DL 35-36.) Based on plaintiff's medical records and his earlier conversation with Dr. Spruell, Dr. Bonner still believed that plaintiff could perform at least sedentary or part-time work. (*Id.* at DL 36.) Dr. Bonner ordered a functional capacity evaluation ("FCE") to assist in his final decision on plaintiff's appeal. (*Id.*) The goal of the FCE was to evaluate plaintiff's physical and functional capabilities. (AR at DL 60.)

The FCE was performed over two days on February 26-27, 2001. (*Id.*) Holly Warnock, the physical therapist who conducted the FCE, noted that plaintiff exhibited some inconsistent behaviors during the testing, including:

> match weighting of the shoulder to overhead lift was the same for the occasional lift as for the frequent lift; Jamar grip testing values were relatively unchanged between grip positions and did not resemble a bell shaped curve; gait deviations did not increase with the FCE or with the frequent circuit despite walking and standing for one hour with reports of increased pain to 9/10; with second day testing, she reported being unable to walk or stand for longer than 4 minutes at a time due to 10/10 pain but she completed a frequent circuit with these activities lasting more than 4 minutes each for one hour.

(*Id.* at DL 60-61.) Due to these inconsistencies, Warnock considered the FCE results for the described activities to represent plaintiff's "minimal capabilities." (*Id.* at DL 61.) With this qualification, Warnock determined that plaintiff could frequently: lift and carry 11-20 pounds, push and pull up to 20 pounds, sit, and stoop. (*Id.* at

12

DL 68.)   She determined that plaintiff could only occasionally: stand, walk, climb, or balance.  (AR at DL 68.)   Overall, Warnock concluded that plaintiff was "capable of light duty work on an 8 hour basis."  (Id. at DL 61.)   She noted that plaintiff functions best "when allowed to change positions between sitting, standing, and walking."  (Id. at DL 69.)

Following the FCE, plaintiff submitted another letter from Dr. Spruell, dated February 27, 2001, in support of her appeal.  In his letter, Dr. Spruell stated:

> This is to certify that [plaintiff] is under my care for a problem of osteoarthritis.  Because of the nature of her illness, she cannot sit or stand for long periods of time and whenever possible, she should keep her feet elevated.

(Id. at DL 57.)

On March 22, 2001, Dr. Bonner again reviewed plaintiff's claim file.  (Id. at DL 52-53.)   He found that the FCE results were consistent with his earlier determination that plaintiff could perform at least sedentary or part-time work.  (AR at DL 52-53.) Accordingly, he upheld his initial decision to deny plaintiff's claim for long-term disability benefits.  (Id.)

As permitted by the terms of the Plan, plaintiff appealed Aetna's decision to the Administrative Committee.  (Id. at DL 49-50.) She did not provide any additional records or information to the Committee, however.  (Id. at DL 6, 12.)   After reviewing plaintiff's

13

file, the Committee upheld the decision to deny plaintiff long-term disability benefits. (*Id.* at DL 1-7.)  Specifically, the Committee concluded that, while there was "little doubt that [plaintiff] was unable to do her customary job" as of August 29, 2000, "the weight of the medical information presented suggested that [plaintiff] was not unable to perform any job on that date."  (AR at DL 7.)

**DISCUSSION**

### I. **Summary Judgment Standard**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c)).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

14

all other facts immaterial.   *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion.   *Id.* at 323; *Apcoa, Inc. v. Fid. Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990).   The movant is not required to negate his opponent's claim, however.   The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."   *Celotex*, 477 U.S. at 325.   After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[4] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)).   While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the control-

---

4   The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

15

Case 1:06-cv-02040-JEC   Document 52   Filed 02/26/08   Page 16 of 26

ling substantive law.   *Id.* at 248.   An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.   *Id.* at 249-50.   The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).   An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative."   *Anderson,* 477 U.S. at 249-50.   Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

## II. **Standard of Review**

The Supreme Court has established three standards for reviewing a plan administrator's decision to deny benefits under a plan governed by ERISA:   1) *de novo* where the plan does not grant the administrator discretion; 2) arbitrary and capricious where the plan grants the administrator discretion; and 3) heightened arbitrary and capricious where the plan grants the administrator discretion but the administrator operates under a conflict of interest.   *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) and *Williams v.*

16

*BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1134 (11th Cir. 2004) (applying the principles announced in *Firestone*).  The Plan in this case states that the Administrative Committee has:

> [t]he discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Eligible Family Member to participate in the Plan or to receive benefits under it, its interpretation and decisions to be final and conclusive...

(DSMF at ¶ 4.)  Further, the Plan grants the Administrative Committee "the broadest discretionary authority permitted under law in the exercise of all of its functions including, but not limited to, deciding questions of eligibility, interpretation, and the right to benefits."  (*Id.*)  The Plan thus contains express language triggering the arbitrary and capricious standard of review.  *See Turner v. Delta Family-Care Disability and Survivorship Plan,* 291 F.3d 1270, 1273 (11th Cir. 2002) (holding that "the arbitrary or capricious standard of review applies to this Plan's decisions because of the broad discretion delegated to the Plan's Administrator in the Plan document").

Moreover, Plan benefits are paid from a trust funded by Delta's periodic, non-reversionary contributions.  (*Id.* at ¶ 6.) Consequently, Delta incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits.  The Eleventh Circuit has held that this funding structure "eradicates any alleged conflict of interest."

17

AO 72A
(Rev.8/82)

*Turner,* 291 F.3d at 1273.  The parties thus agree that the arbitrary and capricious standard applies in this case.

The Court's scrutiny under the arbitrary and capricious standard is limited to determining whether the challenged decision has a rational, good faith basis.  *Cagle v. Bruner*, 112 F.3d 1510, 1518 (11th Cir. 1997) (citing *Blank v. Bethlehem Steel Corp.*, 926 F.2d 1090, 1093 (11th Cir. 1991)).  *See also Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1564 (11th Cir. 1990) (denial is not arbitrary and capricious unless it is "completely unreasonable") and *Guy v. Se. Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir. 1989) (under the arbitrary and capricious standard, the court may determine that a decision was rational regardless of whether it was "right").  This standard applies to both questions of plan interpretation and factual findings.  *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1285 (11th Cir. 2003) (citations omitted).  *See also Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997) ("[W]e consistently have upheld application of the abuse of discretion standard of review to determinations involving both plan interpretations and factual findings under ERISA.").

### III. Materials in the Administrative Record

As an initial matter, the Court addresses defendants' objection to plaintiff's reliance on materials that are not part of the

AO 72A
(Rev.8/82)

administrative record.     In support of her motion for summary

judgment, plaintiff cites several documents that were created after

the Administrative Committee issued its decision on plaintiff's

appeal.   (Pl.'s Mot. For Summ. J. [27] at Exs. A and B; Pl.'s

Statement of Undisputed Material Facts in Support of her Mot. for

Summ. J. [27] at Exs. 3 and 6.)   In particular, plaintiff relies on

an affidavit from Dr. Spruell, dated April 27, 2007. (Pl.'s Mot. for

Summ. J. [27] at Ex. A.)   Dr. Spruell's 2007 affidavit obviously was

not available to the Committee when it denied plaintiff's claim for

benefits.

     Pursuant to the arbitrary and capricious standard, the Court

must review the administrative record as it existed when the

Committee made its decision on plaintiff's appeal. As stated by the

Eleventh Circuit:

> In reviewing a termination of benefits under the arbitrary
> and capricious standard, the function of a reviewing court
> is to discern whether there was a reasonable basis for the
> decision, *relying on the facts known to the administrator
> at the time the decision was made.*

*Buckley v. Metro. Life*, 115 F.3d 936, 941 (11th Cir. 1997)(citing

*Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137,

1139 (11th Cir. 1989) (emphasis added)). *See also Paramore*, 129 F.3d

at 1451 (noting that an administrator's decision is not arbitrary and

capricious unless it is unreasonable based on the facts known to the

administrator at the time the decision was made.)

19

Plaintiff had the opportunity to submit Dr. Spruell's affidavit to the Committee in support of her appeal.  (DSMF [26] at ¶ 5.)  In fact, plaintiff was specifically reminded, several months prior to the Committee's scheduled review of her appeal, that she should forward "any additional information in support of [her] claim" to the Committee.   (AR at DL 13.)   Having denied the Committee the opportunity to consider Dr. Spruell's affidavit, plaintiff cannot rely on the affidavit in support of her motion for summary judgment. Accordingly, defendants' Objection to Materials Outside the Administrative Record [43] is **GRANTED**.  The Court will not consider Dr. Spruell's affidavit, or any other materials that are not contained in the administrative record, in deciding the parties' motions for summary judgment.[5]

## IV.  Application of the Arbitrary and Capricious Standard

Under Section 4.3 of the Plan, plaintiff is entitled to long-term benefits if, as of August 29, 2000, she suffered from a disability that "continuously and totally prevent[ed] her from engaging in any occupation whatsoever for compensation or profit,

---

[5]   These materials include the following documents, which were all created after the Committee's decision on plaintiff's appeal: (1) Dr. Spruell's letter to Delta Air Lines dated February 25, 2002; (2) Dr. Spruell's letter to Pamela Atkins dated November 21, 2005; (3) Dr. Spruell's letter to Pamela Atkins dated  July 11, 2006; and (4) the Social Security Administration's Notice of Decision dated February 25, 2002.

AO 72A
(Rev.8/82)

including part-time work."   (DSMF at ¶ 2.)   In denying plaintiff's

claim, the Administrative Committee reasoned as follows:

> First, Dr. Spruell -- [plaintiff's] own physician -- stated to
> the Aetna medical director in a phone conversation that
> [plaintiff] could reasonably perform work where she could sit
> or stand for comfort and change positions as needed.   Though
> Dr. Spruell later [made] . . . the conclusory statement that
> [plaintiff] was "permanently disabled" or "significant
> disability because of her job" he never stated that she was
> disabled from any job including part time jobs.   In addition,
> the FCE supported a conclusion that [plaintiff] could work in
> a sedentary job, even a full time one.   Accordingly, the
> Committee voted to uphold the denial of benefits in
> [plaintiff's] case.

(AR at DL 7.)   The Court finds that the Committee's decision was

sound, and that it has a good faith, rational basis in the

administrative record.

     As mentioned above, plaintiff submitted two letters from Dr.

Spruell in support of her initial claim for long-term benefits.   In

his first letter, dated June 30, 2000, Dr. Spruell stated that

plaintiff's disability was "permanent" and he estimated that her

return to work date was "[n]ever."   (Id. at DL 31.)   Dr. Spruell did

not describe plaintiff's functional limitations in this letter,

however.   (Id.)   Neither did he specify whether plaintiff was unable

to work in "any occupation whatsoever" or whether she was simply

unable to work as a flight attendant.   (Id.)

     In his second letter, dated August 22, 2000, Dr. Spruell

clarified his belief that plaintiff was "totally and continuously

AO 72A
(Rev.8/82)

disabled from any occupation." (*Id.* at DL 39.)   But Dr. Spruell qualified this opinion by stating that plaintiff "can do no job which requires more than 1-2 hours of standing, sitting, if she has to get up and down, or walking." (AR at DL 39.)   Describing plaintiff's functional limitations, Dr. Spruell stated that plaintiff: "cannot do long periods of standing.   She must not be required to get up and down from a sitting position, climb stairs, or any job, which requires significant walking." (*Id.*)   Although Dr. Spruell's second letter was more descriptive than his first, it still did not clearly explain how plaintiff's condition prevented her from working in "any occupation." (*Id.*)   Of particular importance, Dr. Spruell's description of plaintiff's limitations did not necessarily foreclose sedentary or part-time work.

Because the evidence as to the extent of plaintiff's limitations was somewhat ambiguous, Dr. Bonner spoke to Dr. Spruell about plaintiff's condition. (*Id.* at DL 52.)   According to Dr. Bonner, Dr. Spruell stated that plaintiff could reasonably work if she could sit or stand for comfort and change positions as needed.[6] (*Id.*)   Based on plaintiff's medical records and his conversation with Dr. Spruell, Dr. Bonner determined that plaintiff did not meet the Plan's

---

[6]   Plaintiff failed to provide any evidence to the contrary to the Administrative Committee. (AR at DL 12.)   Dr. Bonner's recollection of the conversation in the administrative record is thus unrebutted.

AO 72A
(Rev.8/82)

stringent eligibility requirements for long-term disability. (AR at DL 52.) This conclusion, which was ultimately adopted by the Committee, was reasonably based on the lack of evidence in plaintiff's claim file concerning her inability to do sedentary or part-time work.

In support of her first appeal of Aetna's decision to deny benefits, plaintiff supplemented her claim file with Pain and Fatigue Questionnaires, which were also completed by Dr. Spruell. (*Id.* at DL 97-100.) The Pain Questionnaire indicated that plaintiff experienced moderately severe pain in her knees as a result of arthritis, and that she needed to elevate her legs and lie down for a minimum of two hours during the day. (*Id.* at DL 98.) The Fatigue Questionnaire similarly stated that plaintiff required a minimum of two hours rest during the day. (*Id.* at DL 100.) Assuming the Pain and Fatigue Questionnaires accurately assessed plaintiff's need for rest and work accommodations, neither document addressed the central deficiency in plaintiff's claim file: that is, the lack of evidence that plaintiff was unable to do sedentary or part-time work.

Plaintiff later supplemented her file with a third letter from Dr. Spruell, dated November 21, 2000, and additional office visit notes from Dr. Spruell. The office visit notes indicated that plaintiff was continuing to receive pain medication and injections, as well as physical therapy, for her knee pain. (*Id.* at DL 82-83.)

AO 72A
(Rev.8/82)

The November 21, 2000 letter stated that plaintiff "has significant disability because of her job" and that she "cannot stand for lengthy period[s] of time." (AR at DL 94.)  The letter further stated that plaintiff "cannot stand to walk more than an hour or so in any given work day." (*Id.*)  Again, however, none of these materials explained how plaintiff's condition prevented her from engaging in "any occupation whatsoever" including sedentary or part-time work.

The only other evidence in plaintiff's claim file is an FCE, the results of which unequivocally support the Committee's decision.[7]  As mentioned, the therapist who conducted the FCE noted that plaintiff exhibited some inconsistent behaviors during the testing. (*Id.* at DL 60-61.)  She therefore considered the FCE results to represent plaintiff's minimal capabilities as to certain activities. (*Id.* at 61.)  With this qualification, the therapist determined that plaintiff was somewhat restricted in her ability to stand and walk, but that plaintiff could function at work if allowed to change positions between sitting, standing, and walking. (*Id.* at DL 68-69.)  She concluded that plaintiff was capable of "light duty work" on a

---

[7]  Plaintiff's file also contains office visit notes from Dr. Vanderlyt, recommending that plaintiff "continue conservative treatment" with Dr. Spruell unless her symptoms "deteriorate and become refractory to medication." (AR at DL 83.)  Dr. Vanderlyt's notes suggest that plaintiff's condition is not sufficiently severe to prevent her from performing "any occupation whatsoever."

AO 72A
(Rev.8/82)

full-time basis.[8]  (AR at DL 61.)

The Court does not doubt that plaintiff's osteoarthritis is painful, and that plaintiff has some work restrictions as a result of her condition.  However, considering plaintiff's FCE results, along with all of the other evidence in the administrative record, the Committee's determination that plaintiff was not eligible for long-term disability benefits is unquestionably reasonable.  Accordingly, the Court **GRANTS** defendants' Motion for Summary Judgment [26] and **DENIES** plaintiff's Motion for Summary Judgment [27].

---

[8]  Citing this Court's decision in *Byrom v. Delta Family Care-Disability and Survivorship Plan,* 343 F. Supp. 2d 1163, 1184-85 (N.D. Ga. 2004), plaintiff argues that the Court should ignore the FCE results.  (Pl.'s Mot. for Summ. J. [27] at 19.)  In *Byrom,* the Court found that the Committee unreasonably relied on FCE results where: (1) the results conflicted with all of the other medical evidence in the record, including an assessment issued by an Aetna-selected specialist, the opinions of all of the plaintiff's treating physicians, and the results of another FCE performed by a second specialist selected by Aetna; and (2) the plaintiff presented evidence that his performance on the FCE had been artificially enhanced by epidural steroid injections that the plaintiff had received shortly before the FCE.  *Byrom,* 343 F.Supp. 2d at 1185. Unlike *Byrom*, the FCE results in this case did not conflict with all of the other evidence in the record, and plaintiff presented no evidence that her FCE results were unreliable for any particular reason, such as recent treatment that artificially enhanced her performance.  It was thus reasonable, in this case, for the Committee to consider the results of the FCE in denying plaintiff's claim.

AO 72A
(Rev.8/82)

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** defendants' Motion for Summary Judgment [26]; **DENIES** plaintiff's Motion for Summary Judgment [27]; **GRANTS** plaintiff's Motion for Leave to File Motion for Summary Judgment Out of Time [33]; **SUSTAINS** defendants' Objection to Materials Outside the Administrative Record [43]; and **GRANTS** defendants' Motion to Exceed Page Limitations [45].

SO ORDERED, this 26 day of February, 2008.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)